## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

Evvie Eyzaguirre, individually and on behalf
of all others similarly situated,

                Plaintiff,

        - against -                            Class Action Complaint

Molson Coors Beverage Company USA LLC,

                Defendant                Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff,

which are based on personal knowledge:

1.     Molson Coors Beverage Company USA LLC ("Defendant") manufactures, labels,

markets, and sells hard seltzer in flavors including "Hint of Watermelon Strawberry," promoted

as "With Antioxidant Vitamin C From Acerola Superfruit" under the Vizzy brand ("Product").



## I.   "BETTER FOR YOU" ALCOHOLIC BEVERAGES

2.   Hard seltzer is based on carbonated water, made from malted barley, or fermented sugar, with a low alcohol content, fruit flavored, and roughly 100 calories or less, compared with beers and wines that have from 100 to 400 calories.

3.   Hard seltzer is marketed to consumers "at the nexus of convenience and health," because it is generally low in calories and sugar, and inexpensive.

4.   In recent years, demand for hard seltzers has exploded, from $200 million in 2018 to over $1 billion today.

5.   According to one of Defendant's senior managers, "[A]ll of the hard seltzers out there are basically the same: the same white packaging, the same flavors, same calories and carbs."

6.   To "counter[s] that sea of sameness, [Vizzy adds] a unique ingredient – antioxidant vitamin C from acerola superfruit," designed to "make a drinker's choice really simple."

7.   Antioxidants are compounds which may prevent or delay cell damage, and include vitamins C and E, selenium, beta-carotene, lycopene, lutein, and zeaxanthin.

## II.   VIZZY

8.   The marketing for Vizzy emphasizes vitamin C, shown on the front panel of a twelve-pack, stating, "WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."



9.    One ad states, "ANOTHER HARD SELTZER? YEAH, BUT WE'VE GOT ANTIOXIDANT VITAMIN C."



10.    Another highlights that Vizzy is the "FIRST HARD SELTZER MADE WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."



11.    Another ad points out the uniqueness of Vizzy, as "THE ONLY HARD SELTZER WITH ANTIOXIDANT VITAMIN C."



12.    In encouraging consumers to purchase Vizzy over its competitors, an advertisement states, "WHEN IN DOUBT, ALWAYS CHOOSE C. VIZZY HARD SELTZER WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."



13. The vitamin C content is promoted alongside pictures of fresh fruit, which gives consumers the impression the Products are a nutritionally-equivalent source of the nutrients found in those fruits, such as the pineapple and mango variety below.



14. The Nutrition Facts of the Watermelon Strawberry Vizzy confirm it contains vitamin C, at 18 mg or twenty percent of the recommended daily value ("RDV"). *See* 21 C.F.R. § 101.9(c)(8).

**Nutrition Facts**

Serving size   1 can

Amount per serving

**Calories 100**

| | % Daily Value |
|---|---|
| **Total Fat** 0g | **0%** |
| **Sodium** 50mg | **2%** |
| **Total Carbohydrate** 2g | **1%** |
| Total Sugars 1g | |
| Includes 1g Added Sugars | **2%** |
| **Protein** 0g | |
| Vitamin C 18mg | **20%** |

Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.

15.    The ingredient list confirms that vitamin C is added through addition of dried acerola cherry juice.

**INGREDIENTS:** SPARKLING WATER, CANE SUGAR, NATURAL FLAVOR, STRAWBERRY JUICE CONCENTRATE, CITRIC ACID, SODIUM CITRATE, AND DRIED ACEROLA CHERRY JUICE.

**INGREDIENTS:** SPARKLING WATER, CANE SUGAR, NATURAL FLAVOR, STRAWBERRY JUICE CONCENTRATE, CITRIC ACID, SODIUM CITRATE AND DRIED ACEROLA CHERRY JUICE

16.    That the addition of dried acerola cherry juice is to add vitamin C is evident because they do not mention cherry flavor.

### III.   CONSUMPTION OF ALCOHOL IS HARMFUL AND CONTRARY TO DIETARY GUIDELINES

17.    Congress concluded that "the American public should be informed about the health

6

hazards that may result from the consumption or abuse of alcoholic beverages," and requires the following statement on these products:

> GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems."

> 27 U.S.C. § 215 (emphasis added).

18.     In 2004, the National Institute on Alcohol Abuse and Alcoholism (NIAAA) wrote:

> Alcoholic beverages primarily consist of water, pure alcohol (chemically known as ethanol [ethyl alcohol]), and variable amounts of sugars (i.e., carbohydrates); their content of other nutrients (e.g., protein, vitamins, or minerals) is usually negligible.

19.     Ethyl alcohol contains seven calories per gram, which means alcoholic beverages are almost entirely empty calories.

20.     The USDA 2020-2025 Dietary Guidelines for Americans ("DGA") advises that "alcoholic beverages are 'not a component of the USDA Dietary Patterns.'"

21.     The DGA advises that, for "[a]dults who choose to drink…to limit daily intakes…so as not to exceed daily calorie limits," and "drinking less is better for health than drinking more."

22.     However, alcoholic beverages account for the additional calories consumed after "meeting food group recommendations in nutrient-dense forms."

23.     Evidence suggests that even drinking within recommended limits may increase the overall risk of death from various causes, such as from several types of cancer and some forms of cardiovascular disease.

24.     Over many years, consumption of excess alcohol can impair the body's ability to digest and utilize nutrients.

25.     According to the CDC, "Excessive alcohol use is responsible for more than 95,000 deaths in the United States each year, or 261 deaths per day.

26.     These deaths shorten the lives of those who die by an average of almost 29 years, for a total of 2.8 million years of potential life lost.

27.     The costs of alcohol consumption are over a quarter trillion dollars per year.

28.     More than half of alcohol-attributable deaths are due to health effects from drinking too much over time, such as various types of cancer, liver disease, and heart disease.

## IV.   ADDITION OF ANTIOXIDANTS AND "SUPERFRUIT" TO ALCOHOL IS MISLEADING AND IN VIOLATION OF LAW

29.     Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits material representations, omissions, or practices that are likely to mislead consumers. Fla. Stat. § 501.204(1).

30.     Florida has adopted the identical federal regulations with respect to the labeling of food. Fla. Stat. § 500.02(2)-(3).

31.     A violation of "[A]ny law, statute, rule, [or] regulation [] which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," also constitutes a violation of FDUPTA. Fla. Stat. § 501.203(3)(c).

32.     Federal and identical state regulations impose requirements on the labeling of food and beverages to prevent consumers from being misled. *See* 21 U.S.C. § 343(a)(1) and Fla. Stat. § 500.11(1)(a) (deeming a food misbranded when it contains a statement that is "false or misleading").

33.     One of these areas involves food fortification, which is the addition of vitamins and nutrients.

34.     Globally, food fortification is beneficial to correct dietary insufficiencies and

nutritional imbalances, such as adding minerals back to refined flour.

35.    However, federal regulations, adopted entirely by this State, prohibit "[T]he random fortification of foods" because this can "result[s] in deceptive or misleading claims." 21 C.F.R. § 104.20(a) (the "Fortification Policy").

36.    The Fortification Policy contains specific rules about when vitamins can be added to foods, and the words that are used to inform consumers about this. 21 C.F.R. § 104.20(h).

A.    Fortification of Carbonated and Alcoholic Beverages Like Vizzy is Misleading

37.    The Fortification Policy "does not  … consider it appropriate to fortify … snack foods such as … carbonated beverages." 21 C.F.R. § 104.20(a).

38.    Fortification of carbonated beverages like Vizzy is prohibited because it consists of empty calories, is not nutrient-dense, and is not intended to be a significant part of a balanced diet.

39.    Studies have shown that fortification of vitamin-fortified snack foods, such as carbonated beverages, causes consumers to make negative diet-related decisions.

40.    This is because consumers are less likely to examine the ingredients and Nutrition Facts, when faced with prominent fortification claims.

41.    The result is that consumers are more likely to purchase a fortified product and believe it is healthier than a comparable nonfortified product.

42.    In 2010, the FDA stated that "fortification of alcohol beverages with nutrients is not consistent with [its] fortification policy (21 C.F.R. § 104.20) or the U.S. Dietary Guidelines." FDA Letter, July 21, 2010, to Administrator of the Alcohol and Tobacco Tax and Trade Bureau ("TTB") ("FDA Letter").

43.    This was because alcoholic beverages which "contain added vitamins or minerals" "ha[ve] no apparent public health benefit and could be misleading to consumers who may perceive

these alcohol beverages as a healthy product."

44.     This position was affirmed in a 2015 Guidance Document where the FDA stated it did not consider "it appropriate to add vitamins and minerals to alcoholic beverages."

45.     In 2021, the non-profit Center for Science in the Public Interest ("CSPI") invoked the Fortification Policy in noting "[Vizzy's] claims such as 'made with antioxidant vitamin C' convey healthfulness and are misleading on alcoholic beverages given their empty calories, association with serious health conditions, and anti-nutrient properties."

     B.     <u>Product's Nutrient Content Claims do Not Comply With Regulations</u>

46.     Congress required the FDA to establish nutrient content claims for statements that inform consumers about the amount and type of nutrients contained in food, to prevent consumers from being misled by the endless terms and descriptors appearing on foods.

47.     The statement, "With Antioxidant Vitamin C from Acerola Superfruit," tells consumers the Product contains acerola, a "superfruit."

48.     Consumers understand "superfruit" as shorthand for a fruit that contains high levels of vitamins, including vitamin C.

49.     The statement, "With Antioxidant Vitamin C from Acerola Superfruit," is an implied nutrient content claim, because it tells consumers the Product contains an ingredient, acerola, a type of "superfruit," known to contain high levels of nutrients, including vitamin C. 21 C.F.R. § 101.65(c).

50.     However, the statement is not an authorized implied nutrient content claim because no such claims are permitted in the context of adding nutrients to alcoholic beverages.

51.     The statement, "With Antioxidant Vitamin C from Acerola Superfruit," is an implied nutrient content claim, because it suggests to consumers that the Product, because of its nutrient

content, may help them maintain healthy dietary practices. 21 C.F.R. § 101.65(d).

52.     The statement, "with Antioxidant Vitamin C from Acerola Superfruit," implies the Product is a healthful source of nutrients. 21 C.F.R. 101.65(d)(2)(iv).

53.     The statement is not an authorized implied nutrient content claim because no evidence supports any beneficial effects of adding a small amount of acerola powder to an alcoholic beverage.

54.     The Dietary Guidelines encourage consumers to select "healthful sources of nutrients as part of a well-rounded diet" instead of meeting vitamin-intake guidelines through consumption of alcoholic beverages such as Vizzy.

55.     The emphases on "antioxidant Vitamin C" and "Acerola Superfruit" suggests the Products are "a healthful source of nutrients, obscuring the fact that alcoholic beverages provide empty calories, are associated with serious health conditions, and can impair the body's metabolism of nutrients," like vitamin C.[1]

56.     Advertising health benefits of the Products through the addition of antioxidants and "superfruit" caused consumers, like Plaintiff, to misconstrue the negative effects of even moderate amounts of alcohol consumption.

57.      Even though the Products contain twenty percent of the daily value of vitamin C, it is necessary to consume an alcoholic beverage to get this amount.

58.     Current scientific research indicates that 20% of the daily value of vitamin C cannot provide health benefits to overcome the negative effects of one alcoholic beverage.

59.     Scientific research suggests that isolated antioxidants, such as vitamin C, do not provide the same health benefits as antioxidants from a diet rich in fruits and vegetables.

---

[1] CSPI, Vizzy Enforcement Letter, Mar. 15, 2021.

60.     Clinical studies show that vitamin C, consumed alone, lacks the same positive effects when it is consumed as part of a diet rich in fruits and vegetables.

61.     The statement, "With Antioxidant Vitamin C," is an express nutrient content claim about the level of vitamin C in the Product. 21 C.F.R. § 101.13(b)(1).

62.     Labeling a food as a "good source" of a nutrient is an express nutrient content claim because it is a direct statement about the level (or range) of a nutrient in a product. 21 C.F.R. § 101.13(b)(1).

63.     "Good source" or its authorized synonyms, "contains," and "provides," can be used where a food has between ten and nineteen percent of the Recommended Daily Intake ("RDI") or Daily Reference Value ("DRV") of that highlighted nutrient. 21 C.F.R. § 101.54(c)(1).

64.     Describing the Product as "With Vitamin C" is similar to telling consumers it is a "good source" of vitamin C, because "with" has a similar definition to "contains." 21 C.F.R. § 101.54(c)(1).

65.     However, "with" is not an authorized synonym for "good source," which means its use is prohibited.

66.     Synonyms which are not authorized, like "with," are prohibited from being used in a nutrient content claim.

67.     The reason is to prevent nutrient content claims which are or can be misleading.

68.     If a company could escape the reach of the regulations by use of a thesaurus, consumers would be misled.

C.     Other Fortification Requirements are not Met

69.     The Product fails to comply with other criteria established by the Fortification Policy for lawfully and non-deceptively adding nutrients.

70.    The Product does not comply with the Fortification Policy because there is not a dietary insufficiency caused by a lack of vitamin C, which would permit it being added.  21 C.F.R. § 104.20(b).

71.    According to the National Institutes of Health, vitamin C deficiency is rare, and the average American exceeds the RDI for vitamin C.

72.    Since vitamin C is water soluble, any excess intake will not be stored in the body but excreted through normal functioning.

73.    Alcohol consumption interferes with absorption and use of nutrients like vitamin C, by altering the transport, metabolism, and storage of such nutrients.

74.    Consumption of alcoholic beverages including the Product reduces the level of vitamin C in the body.[2]

75.    The addition of vitamin C to the Products is prohibited because no vitamin C is lost in storage, handling, or processing of the Product, because it did not contain any vitamin C to begin with. 21 C.F.R. § 104.20(c)(1).

76.    The addition of vitamin C to the Products is prohibited because it is not added in proportion to the caloric content, because the Product contains 100 calories, yet 20% of the daily value for vitamin C, based on 2,000 calories per day. 21 C.F.R. § 104.20(d).

77.    The addition of vitamin C to the Product is prohibited because it does not contain all the required nutrients per 100 calories based on 2,000 calories per day. 21 C.F.R. § 104.20(d)(3).

78.    For instance, the Products have no protein. 21 C.F.R. § 104.20(d)(3).

---

[2] Defeng Wu and Arthur I. Cederbaum. "Alcohol, Oxidative Stress, and Free Radical Damage;" Hartman et al. "Moderate alcohol consumption and levels of antioxidant vitamins and isoprostanes in postmenopausal women."

79.     The addition of vitamin C to the Products is prohibited because even though vitamin C is generally recognized as safe ("GRAS") under the food additive regulations, upon information and belief, no GRAS notification has been submitted with respect to its addition to alcoholic beverages. 21 C.F.R. § 104.20(g); 21 C.F.R. §§ 182.3013, 182.8013.

80.     The addition of vitamin C to the Products is prohibited because it is not bio-available when consumed via an alcohol beverage. 21 C.F.R. § 104.20(g)(2).

## V.     PRODUCT LACKS A HINT OF WATERMELON

81.     The Watermelon Strawberry Vizzy misleads consumers through the statement, "Hint of Watermelon Strawberry" and pictures of watermelon and strawberry.

82.     "Hint" is understood as describing a non-*de minimis* amount of something.

83.     While the ingredients list strawberry juice, no watermelon ingredients are identified.

84.     This means that the Product does not have a "hint" of watermelon, and at best, only compounds isolated and synthesized from watermelon.

## VI.     CONCLUSION

85.     Defendant makes other representations and omissions with respect to the Products which are false and misleading.

86.     Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

87.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

88.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

89.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

90.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $15.99 for a pack of twelve 12 OZ cans, excluding tax and sales, higher than similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

91.     Other similar products without claims of added vitamins and nutrients are sold for $8.99 for a pack of twelve 12 OZ cans, excluding tax and sales.

Jurisdiction and Venue

92.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

93.     The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

94.     Plaintiff Evvie Eyzaguirre is a citizen of Florida.

95.     Defendant Molson Coors Beverage Company USA LLC is a Delaware limited liability company with a principal place of business in Chicago, Cook County, Illinois. and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff.

96.     The location of a principal place of business does not impact a limited liability company's citizenship for the purposes for diversity jurisdiction.

97.     A limited liability company's citizenship includes every state of which its managers or members are citizens.

98.     Based on information obtained from the website of the Illinois Secretary of State,

Defendant is managed by five members, all listed with the same address in Milwaukee, Wisconsin.

99.   The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

100.   The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

101.   The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

102.   Venue is in the Fort Lauderdale Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Broward County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

<u>Parties</u>

103.   Plaintiff Evvie Eyzaguirre is a citizen of Davie, Broward, Florida.

104.   Plaintiff likes fruits and vegetables and eating healthy.

105.   Plaintiff also likes moderate consumption of alcoholic beverages on occasion.

106.   Plaintiff knows consuming alcohol isn't the best thing, but the promotion of antioxidants caused her to choose and consume Vizzy, because the added vitamin C made her feel like she was consuming a product with beneficial ingredients.

107.   Defendant Molson Coors Beverage Company USA LLC is a Delaware limited liability company with a principal place of business in Chicago, Illinois, Cook County.

108.   Molson Coors is one of the largest producers of alcoholic beverages in the world.

109.   Defendant is the custodian of several of the most respected alcoholic beverage

brands, including Coors and Molson beer.

110.  Vizzy Hard Seltzer was introduced to capitalize on growing consumer demand for "hard seltzer," which are increasingly formulated and marketed to appear as healthy "fruit" beverages, like juice or a low-calorie seltzer.

111.  Defendant realized that to drive sales, it could add "healthful" qualities to hard seltzer through addition of vitamin C.

112.  The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

113.  Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Cumberland Farms, 12500 W State Rd 84 Davie FL 33325-3442, between October 30, 2021, and December 30, 2021, and/or among other times.

114.  Plaintiff believed and expected the Product contained ingredients whose positive effect outweighed the negative effects from consuming alcohol because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

115.  Plaintiff seeks to purchase OTC and other products which contain herbal ingredients that contribute to those products' functionality.

116.  Through reading and understanding the Product's labeling, including the references to vitamin C, Plaintiff eschewed consumption of foods which were natural sources of vitamin C and/or and did not consult the Nutrition Facts.

117. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims,

statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

118.   Plaintiff bought the Product at or exceeding the above-referenced price.

119.   Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

120.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

121.   The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

122.   Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

123.   Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar hard seltzers that do not even make nutrient claims, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

124.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Mississippi, South Carolina, Louisiana, and Arkansas who purchased the Product during the statutes of limitations for each cause of action alleged.

125. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

126. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

127. Plaintiff is an adequate representative because her interests do not conflict with other members.

128. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

129. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

130. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

131. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), Fla. Stat. § 501.201 et seq.</u>

<u>(Consumer Protection Statute)</u>

132. Plaintiff incorporates by reference all preceding paragraphs.

133. Plaintiff believed the Product contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

134. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

135. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

136.   Plaintiff relied on the representations and omissions to believe the Product contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

137.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

138.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

139.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

140.   Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

141.   As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

142.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,<br>Implied Warranty of Merchantability/Fitness for a Particular Purpose and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.

143.   The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

144.  Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

145.  Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

146.  Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

147.  Defendant's representations affirmed and promised that the Product contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

148.  Defendant described the Product so Plaintiff and consumers believed it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol, which became part of the basis of the bargain that it would conform to its affirmations and promises.

149.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

150.  This duty is based on Defendant's outsized role in the market for this type of Product, a trusted brand known for the highest quality products.

151.  Plaintiff recently became aware of Defendant's breach of the Product's warranties.

152.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

153.  Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

154.  Defendant received notice and should have been aware of these issues due to

complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

155. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

156. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

157. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

158. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

159. Defendant had a duty to truthfully represent the Product, which it breached.

160. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand known for the highest quality products.

161. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

162.   These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

163.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

164.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

165.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

166.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained ingredients whose positive effect outweighed the negative effects from consuming alcohol.

167.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

168.   Defendant knew of the issues described here yet did not address them.

169.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

170.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   May 10, 2022

                                Respectfully submitted,

                                /s/Will Wright

                                The Wright Law Office, P.A.
                                Will Wright
                                515 N Flagler Dr Ste P300
                                West Palm Beach FL 33401-4326
                                Tel: (561) 514-0904
                                willwright@wrightlawoffice.com

                                Sheehan & Associates, P.C.
                                Spencer Sheehan*
                                60 Cuttermill Rd Ste 412
                                Great Neck NY 11021
                                Tel: (516) 268-7080

spencer@spencersheehan.com
*Pro Hac Vice Application Forthcoming